In re CUMBERLAND FARMS,
INC., Debtor.

CUMBERLAND FARMS, INC., Plaintiff,

v.

MONTAGUE ECONOMIC DEVELOP-
MENT AND INDUSTRIAL COR-
PORATION, Defendant.

Bankruptcy No. 92–41305–JFQ.
Adv. No. 93–4246.

United States Bankruptcy Court,
D. Massachusetts.

June 9, 1994.

David P. Lemoie, Adler, Pollock & Sheehan, Providence, RI, for Cumberland Farms, Inc.

Debra Purrington, Morse, Fenton & Sacks, Northampton, MA, for Montague Economic Development Corp.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

This is what should have been a simple eminent domain case. It is anything but that. It and its companion cases have passed through more state and federal courts than perhaps any eminent domain litigation in the history of this Commonwealth. As a result, the mere passage of time has spawned two of the many claims presented here—the taking

authority's claim for use and occupancy and the property owner's claim for interest on the damage award.

Originally filed in state court, this is the petition of Cumberland Farms, Inc. (the "Debtor") for assessment of damages from an eminent domain taking by Montague Economic Development and Industrial Corporation ("MEDIC"). Set forth here are the court's findings of fact and conclusions of law following a bench trial.

## I. *FACTS ON ECONOMIC DEVELOPMENT AND INDUSTRIAL CORPORATION*

MEDIC is a corporation formed pursuant to chapter 121C of the Massachusetts General Laws for the purpose of undertaking an economic development project in the Town of Montague, Village of Turners Falls, Massachusetts. The project is part of the Massachusetts Heritage State Park Project. Its plan includes a park, a town common and other attractions designed to promote tourism in the area.

The Debtor owns hundreds of combination convenience stores and gasoline stations located in many states. One of these was within the planned economic development area. The Debtor at all relevant times owned the property as successor by merger to V.S.H. Realty, Inc., an affiliate of the Debtor. After sales negotiations initiated by MEDIC came to an impasse, MEDIC took the Debtor's property by eminent domain pursuant to an order of taking recorded with the Franklin County Registry of Deeds on September 21, 1990. On October 9, 1990, MEDIC gave the Debtor formal notice of the order of taking and of its *pro tanto* award of $356,000. The sum of $356,000 was based upon a valuation of $380,000 less $24,000 reserved for possible use in remediating any gasoline contamination thereafter determined to exist.

The Debtor made written demand for payment of the *pro tanto* award on October 16, 1990. MEDIC thereafter enclosed a *pro tanto* application form to be signed and returned by the Debtor. By then, however, the Debtor had decided to contest the taking and declined to receive the *pro tanto* award, apparently on the theory that this would prejudice its challenge to the taking's validity.

The Debtor launched its challenge by suit filed in Norfolk Superior Court on April 25, 1991, which was later transferred to Franklin Superior Court. The suit appears to have been frivolous. It alleged lack of individual notice to the Debtor of a public hearing on the development plan, as well as various nonexistent defects in the development plan and the planning process. Because MEDIC asserted counterclaims, the suit was stayed by the automatic stay following the Debtor's filing of a chapter 11 petition with this court on May 1, 1992.

On December 31, 1993, Judge Spina of the Franklin Superior Court entered judgment granting MEDIC's motion for summary judgment and declaring the taking valid. The Debtor's appeal of that judgment is pending. Following Judge Spina's order, the Debtor also challenged the taking on constitutional grounds in federal district court. That action is apparently still pending.

Meanwhile, MEDIC was frustrated in its attempts to take possession of the property. Under Massachusetts law, a business whose property is taken by eminent domain may be required to vacate the premises at the expiration of four months after it is given notice of taking. Mass.Gen.L. ch. 79, § 8B. That notice was given the Debtor on October 9, 1990. By letter dated January 8, 1991, MEDIC demanded that the Debtor vacate the premises by February 13, 1991. The letter also advised the Debtor it was subject to a charge for the fair rental value of the property until it vacated. When the Debtor declined to vacate, MEDIC, on March 18, 1991, commenced an action in the District Court of Greenfield for possession of the property, employing the summary process procedure set forth in chapter 239 of the Massachusetts General Laws. This case eventually found its way to the Superior Court of Franklin County. On January 27, 1992, that court notified the parties that the Debtor's motion to dismiss had been allowed on the ground MEDIC was not among the parties entitled to employ summary process

procedure under section 1 of chapter 239 and that its proper procedure for possession is set forth in chapter 79, the eminent domain statute. Following some additional unexplained delay, the Franklin Superior Court entered judgment on August 23, 1993 dismissing the complaint.

MEDIC then proceeded to employ the procedure for possession set forth in the eminent domain statute. That statute permits the taking authority to simply issue a warrant for possession and deliver it to a sheriff, who can execute the warrant "using such force as he may deem necessary for the purpose." *See* Mass.Gen.L. ch. 79, § 3. The Franklin Superior court denied the Debtor's request for an injunction against MEDIC taking this action. The Debtor then filed a motion in the Massachusetts Appeals Court requesting stay of execution of the warrant pending the Debtor's appeal of the denial of its request for a preliminary injunction. Characterizing the Debtor's assertion of irreparable damage as hyperbole, the Appeals Court denied the motion on August 31, 1993. MEDIC took possession shortly thereafter, but not without receiving a letter of pure bombast from the Debtor's counsel.

The Debtor thereafter filed the present petition for assessment of damages in Franklin Superior Court. MEDIC removed the action to this court.

The foregoing outlines the basic factual background. Additional findings are set forth in discussions of the applicable legal principles.

## II. PROPERTY'S FAIR MARKET VALUE

I find the fair market value of the property to be $380,000 as of the time of the taking. This was the value testified to by MEDIC's expert, who arrived at the figure through capitalizing the property's fair rental value. This witness's testimony is more credible than the testimony of the Debtor's expert, who opined at $430,000. Although the Debtor's expert also capitalized income, he treated as income the net profit generated by the Debtor's business, rather than rent that can be derived from the property. Although the property is arguably single purpose real estate, the Debtor's expert confused income that can be derived from business operations with income that can be derived from the property itself.

Neither party introduced evidence concerning possible contamination of the property. Thus I make no reduction in value by reason of any such contamination.

## III. INTEREST

■ The Debtor seeks interest from the date of the taking, at the ten percent annual rate set forth in the eminent domain statute. MEDIC contends no interest is payable on $356,000. Pointing to its willingness to pay the $356,000 *pro tanto* award, both before and after the Debtor made demand for it, MEDIC asserts this excuses it from paying interest on that amount.

The eminent domain statute governing interest, section 37 of chapter 79, is set forth in full below.[1] The statute declares in part:

> Damages under this chapter shall bear interest at the rate of ten percent per annum from the date as of which they are assessed until paid, except that an award shall not bear interest after it is payable unless the body politic or corporate liable therefor fails upon demand to pay the same to the person entitled thereto. Mass.Gen.L. ch. 79, § 37.

I am today granting an "award" of $380,000 through entry of judgment. That award

---

1. Mass.Gen.L. ch. 79, § 37 provides as follows:
 Damages under this chapter shall bear interest at the rate of ten percent per annum from the date as of which they are assessed until paid, except that an award shall not bear interest after it is payable unless the body politic or corporate liable therefor fails upon demand to pay the same to the person entitled thereto. Interest shall be added by the clerk of the court to the damages expressed in a verdict, finding, or order

for judgment. A judgment, whether against the commonwealth or any other body politic or corporate, shall bear interest at the rate of ten percent per annum from the date of the entry of such judgment to and including the last day of the month prior to the month in which such judgment is satisfied, except that a judgment against the commonwealth shall not bear interest if it is satisfied within thirty days of such entry.

is "payable" within thirty days after all rights of appeal from the judgment are exhausted or waived. Mass.Gen.L. ch. 79, § 36A.[2] Thus, if the award referred to in section 37 is considered to be only that judgment, that section's prohibition of interest after the award is payable, absent demand and refusal, has no application here because the award is not yet payable.

MEDIC contends, however, that it made an earlier award of its own, in the form of its $356,000 *pro tanto* offer, and that it was perfectly willing to pay the award before and after the Debtor's demand for its payment. The notice of taking mailed to the Debtor on October 9, 1990 stated in part: "For damages to the land taken sustained by CUMBERLAND FARMS, INC., supposed owner, by reason of this taking, an award of THREE HUNDRED FIFTY SIX THOUSAND ($356,000) DOLLARS was made, subject to proof of title." The notice then went on to state where the Debtor should direct a request for payment and to assure the Debtor that acceptance of the payment would not prejudice any claim for a larger sum. The initial order of taking, recorded on September 21, 1990, referred to this award in these words: "For damages sustained by reason of the aforesaid taking, and in accordance with the provisions of Chapter 79, Section 6 of the General Laws, as amended, awards have been made." Section 6, which is quoted in full below,[3] speaks of the *pro tanto* payment as an "award." It requires that the initial order of taking make the award and commands that the award "shall be paid."

The conclusion seems inescapable that the reference to an "award" being "payable" in section 37, the statute governing interest, encompasses the initial *pro tanto* offer as well as any subsequent judgment. That award was "payable" under the initial order of taking of September 21, 1990, and MEDIC did not refuse payment following the Debtor's demand. Thus the statutory command that no interest be paid applies.

■ This denial of interest involves no violation of either Article Ten of the Massachusetts Declaration of Rights or the Fifth Amendment to the Constitution of the United States. Article Ten requires "reasonable compensation" for a land taking, and the Fifth Amendment requires "just compensation" therefor. In *Woodworth v. Commonwealth,* 353 Mass. 229, 230 N.E.2d 814 (1967), the Supreme Judicial Court of Massachusetts dealt with an earlier version of the statute. That earlier version had been previously construed by the court to prohibit postjudgment interest, but without discussion of constitutional considerations. *See General Electric Co. v. Commonwealth,* 329 Mass. 661, 110 N.E.2d 101 (1953). The court in *Woodworth* held that Article Ten and the Fifth Amendment required payment of postjudgment interest.

The statute involved in *Woodworth* was unlike the statute here. Section 37 requires the payment of interest on an award after the award is payable, provided only that the taking authority shall have failed to make payment upon demand. The statute's requirement of a demand as a condition to post-award interest accrual is too minimal to have constitutional implications.

■ The foregoing applies only to the $356,000 *pro tanto* award. The Debtor is entitled to interest on the $24,000 excess at ten percent per annum from the date of the taking, September 21, 1990, until it is paid, but not after it is payable unless MEDIC

---

2. Gen.L. ch. 79, § 36A provides:
 The body politic or corporate against which an award is made under section seven, nine or ten, or against which a judgment is entered under section fourteen, shall, within thirty days after all rights of appeal therefrom have been exhausted or waived, make payment in accordance with such award or judgment.

3. Mass.Gen.L. ch. 79, § 6 provides:
 When a taking is made on behalf of a body politic or corporate other than a corporation described in section seven, the board of officers by whom the order of taking is adopted shall, at the time of the adoption thereof, award the damages sustained by every person in his property by reason of such taking. Such award may be amended by said board of officers at any time prior to the payment thereof by reason of a change in ownership or value of said property before the right to damages therefor has become vested or for other good cause shown. Such damages shall be paid by such body politic or corporate unless other provision is made by law.

fails to pay it upon demand. Mass.Gen.L. ch. 79, § 37. The $24,000 shall not become payable until the lapse of thirty days after all right to appeal from today's judgment have been exhausted or waived. Mass.Gen.L. ch. 79, § 36A. But MEDIC's use and occupancy charges discussed below have also been due for many months. They far exceed $24,000. If interest were to be awarded on these charges, there would be a complete offset. I therefore award no interest on the $24,000.

## IV. MEDIC's CLAIM FOR USE AND OCCUPANCY

The Debtor had the right to remain on the premises until the lapse of four months from the date notice of the taking was given it. Mass.Gen.L. ch. 79, § 8B. MEDIC sent the Debtor notice of the taking on October 9, 1990. MEDIC could only exercise its possessory rights after the lapse of a thirty day written notice to vacate sent by registered mail (or posted on the property). Mass. Gen.L. ch. 79, § 3. Thus, MEDIC was acting within its rights when, by certified letter dated January 8, 1991, it notified the Debtor to vacate the premises by midnight of February 13, 1991. In its counterclaim, MEDIC requests payment of the fair value of the Debtor's occupancy from February 14, 1991 to August 30, 1993, period of some thirty and one-half months. MEDIC bases its claim both upon principles of unjust enrichment and a Massachusetts statute.

The eminent domain statute says nothing, one way or the other, concerning a taking authority's right to a charge for use and occupancy during a holdover following lapse of the four month period. Chapter 79 sets forth the procedure for entry through issuance of the authority's own warrant. See Mass.Gen.L. ch. 79, § 3. Because of the simple effectiveness of this procedure, the Massachusetts legislature may well have presumed there would be no holdover, at least none of any duration. This might permit an inference the legislature intended the authority to have no claim for use and occupancy during an envisioned short holdover period. But that inference would clearly not apply to the period of over thirty months involved here.

The Massachusetts regulation on relocation assistance contemplates charges for use and occupancy following a taking. It directs the taking authority to inform the property owner of what it expects in rent during any holdover period. See 760 CMR § 27.03(13). In its letter of January 8, 1991, MEDIC advised the Debtor of the Debtor's liability for the property's "fair market rental value."

### A. Statutory Liability of Tenant at Sufferance

In light of this statutory and regulatory pattern, is the Debtor liable for reasonable use and occupancy charges? I start with the rule governing the more usual claim for use and occupancy against a tenant who holds over following expiration of his tenancy. Massachusetts has a statute on this. It provides: "Tenants at sufferance in possession of land or tenements shall be liable to pay rent therefor for such time as they may occupy or detain the same." Mass.Gen.L. ch. 186, § 3.

The parties disagree on whether the Debtor qualifies as a tenant at sufferance during the holdover period. The Franklin Superior Court did not decide this question in its dismissal of MEDIC's summary process action. The court merely dismissed that action on the ground that the eviction procedure available under the eminent domain statute, not summary process procedure, should be employed. The summary process statute, moreover, covers numerous parties other than tenants or former tenants, so an order of dismissal would not necessarily be based upon a ruling concerning a party's status as a "tenant." See Mass.Gen.L. ch. 239, § 1.

A tenant at will becomes a tenant at sufferance, obligated to pay fair rental value under the statute, when his lessor conveys or leases the property to another who does not assent to the tenancy. Emmes v. Feeley, 132 Mass. 346 (1882); Swift v. Boyd, 202 Mass. 26, 88 N.E. 439 (1909). Holding over after the expiration of a lease for a term of years also makes the tenant liable for fair rental value under the statute. Zevitas v. Adams, 276 Mass. 307, 177 N.E. 114 (1931); Pierce v. Kolikof, 232 Mass. 479, 122 N.E. 558 (1919).

The only Massachusetts case involving a taking was a claim against a tenant. In *Lowell Housing Authority v. Save–Mor Furniture Stores, Inc.*, 346 Mass. 426, 193 N.E.2d 585 (1963), a taking authority sought use and occupancy charges from a tenant of the former owner who stayed on for several months after the taking. The court held that the taking terminated the tenant's lease and the tenant was thereafter a tenant at sufferance liable for rent under the statute. The court reasoned that the taking authority had succeeded to the lessor's estate, and that the purpose of the statute was to provide just compensation for occupancy.

The Debtor contends it did not become a tenant at sufferance. That term, says the Debtor, applies only to a former tenant who is in possession under no claim of right or superior title. The Debtor says it had a claim of superior title in that it was challenging the taking's validity. Such a suit, the Debtor points out, is expressly recognized in the eminent domain chapter, which contains a statute of limitations for suits in which "the right of a body politic or corporate to effect a particular public improvement or to make a particular taking is drawn in question." *See* Mass.Gen.L. ch. 79, § 18.

The Debtor overly restricts the types of parties who qualify as tenants at sufferance. Courts elsewhere recognize that the property owner who wrongfully holds over after a taking becomes a tenant at sufferance. *E.g.*, *Connecticut v. Sallak*, 244 A.2d 60 (Conn. App.Div.1968). I conclude the Debtor was a tenant at sufferance within the meaning of the Massachusetts statute.

## B. *Principles of Unjust Enrichment*

■ Whether the Debtor was a tenant at sufferance within the meaning of the Massachusetts statute is not, in any event, determinative. The statute is but an application of the general principle that a "person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Restatement of the Law of Restitution*, § 1 (1939). By its own admission concerning its claim for lost profits discussed later, the Debtor earned a profit from its continued operation of the store during this period. Indeed, Turners Falls was one of its more profitable locations. In any event, without regard to generation of profits during the holdover period, the Debtor enjoyed the use and occupation of the property for over thirty months beyond the statutory four month grace period.

The courts have imposed, on equitable grounds, reasonable use and occupancy charges during a holdover period after a taking. For example, in *United States v. Certain Interests in Property, etc.*, 302 F.2d 201 (2d Cir.1962), the eminent domain statute authorized the court "to fix the time within which and the *terms upon which* the parties in possession shall be required to surrender possession to the petition." *Id.* at 203 (emphasis in original). The court required the party whose property was taken to pay the government the fair market value of the right to remain in possession during the holdover period.

The Debtor might seek to distinguish the *Certain Interests* case because of the presence there of a statute concerning the parties rights during a holdover. But courts have also imposed reasonable use and occupancy charges during the post-taking period in the absence of a statute. They do so on equitable grounds. *See, e.g., Century Investment Corp. v. United States*, 277 F.2d 247 (9th Cir.1960); *Redevelopment Agency of City of Norwalk v. The Norwalk Aluminum Foundry Corp.*, 155 Conn. 397, 233 A.2d 1 (1967); *Pattison v. Buffalo, Rochester & Pittsburg Ry. Co.*, 268 Pa. 555, 112 A. 101 (1920); *School District of Ogden v. Smith*, 113 Ark. 530, 168 S.W. 1089 (1914).

MEDIC introduced evidence that the fair annual rental value of the property is 11% of annual gross convenience store sales plus two cents per gallon of annual gasoline sales. This comes to $81,225 per year as of the time of the taking, after a 10% deduction for vacancy and uncollected items. MEDIC's witness did not testify to fair rental value in the years following the taking. There was, however, evidence of the Debtor's somewhat lower sales and profits in the years 1991 through 1993. I also received testimony from the Debtor's expert that the annual fair rental value during these years was $18,000.

I conclude, giving some weight to all the testimony, that during the holdover period the premises had an average fair rental value of $4,500 per month, or $54,000 per year. It is not unjust for MEDIC to receive fair rental value and at the same time avoid payment of interest on the $356,000 *pro tanto* award. MEDIC offered to pay that award at the time of the taking. The Debtor has only itself to blame for not accepting that award as a *pro tanto* payment.

## V. DEBTOR'S CLAIM FOR RELOCATION COSTS

 In the last count of its amended complaint, the Debtor alleges MEDIC has failed to reimburse it for allowable relocation expenses. After vacating the premises, the Debtor on October 14, 1993 purchased at a foreclosure auction property in Turners Falls that had previously been operated by a competitor of the Debtor as a convenience store and gas station. The new location required physical alterations sufficiently substantial to mandate a building permit, which was finally issued on April 29, 1994, slightly more than a month ago. As of the time of trial, the Debtor had not yet commenced operations at the new location.

At trial, the Debtor submitted a detailed expense itemization, which may be summarized as follows:

| | |
|---|---|
| Shipping inventory & equipment to storage | $ 9,965.00 |
| Shipping inventory & equipment to new location | 9,965.00 |
| Ten months' storage costs | 2,000.00 |
| License & inspection fees at new location | 9,264.00 |
| Installation of new gas dispensers | 30,000.00 |
| Physical changes at new location | 23,300.00 |
| Search for new location | 18,920.00 |
| Total | $103,414.00 |

The Debtor relies upon section 7 of chapter 79A of the Massachusetts General Laws, whose relevant portion is set forth below.[4]

That statute, however, is not broad enough to encompass all these expenses. It authorizes reimbursement of reasonable expenses incurred with respect to "moving," "losses of tangible personal property" and "searching for a replacement business." The Debtor's claimed expenses coming within this language are limited to the these items: the two shipping charges of $9,965.00 each, the $2,000.00 storage cost, and the following items among the claimed $18,920 of search expenses: transportation, meals and lodging—$460.00; site assessment trips and economic valuation efforts of employees—$14,460.00. This makes a total of $36,850.00. Costs related to the new locations for licenses, inspections, new equipment, physical changes and closing on the purchase are not allowable under the statute.

Section 7 requires moving expenses be "actual documented" and that the other expenses be "actual." The section also requires that reimbursement be sought "upon proper application" to the taking authority. The first time MEDIC saw this request was when it was introduced at trial. That is hardly "proper application." Regulations issued under section 7 spell out the required forms and documentation. MEDIC, however, does not pose this objection, recognizing that under regulations a claim can be filed within twelve months from displacement. I will therefore not decide the matter on this basis.

 MEDIC does raise a defense to the claim. It asserts that another chapter of the General Laws places a $25,000 limit on the claim. Section 5 of 121C, the chapter under which MEDIC was incorporated, includes the following provision:

The corporation [MEDIC] is hereby directed to pay the reasonable relocation

---

4. Mass.Gen.L. ch. 79A, § 7 provides in part:
I. (A) Any agency or person specified under this act which acquires real property, or issues an order to vacate real property for purposes of rehabilitation, or demolition, or other improvement, shall make fair and reasonable relocation payments to displaced persons and businesses, upon proper application, for:
1. actual documented reasonable expenses in moving himself, his family, his business, farm operation, or other personal property;

2. actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the relocation agency; and
3. actual reasonable expenses in searching for a replacement business or farm.

costs of persons and businesses displaced as a result of carrying out an economic development plan as authorized by clause (1) of this section; provided, that the corporation shall not be *required hereby* to pay or contribute to the payment of such costs of any relocatee in excess of twenty-five thousand dollars. (emphasis supplied).

Section 5 of chapter 121C and section 7 of chapter 79A are like two ships passing in the night, neither recognizing the existence of the other. One places a limit on relocation expense reimbursement. The other does not. The two statutes are nevertheless reconcilable. Use of the words "required hereby" indicate the $25,000 limit is applicable only to the general relocation costs directed to be paid by section 5, not to the more detailed and unlimited costs to be paid under section 7 of chapter 79A. Thus, the mandate of section 7 is left undisturbed. I therefore add the sum of $36,390.00 to the eminent domain award.

## VI. *DEBTOR'S CLAIM FOR LOST PROFITS*

The Debtor's final claim can be quickly dispatched. The last count of the Debtor's amended complaint alleges MEDIC failed to provide the Debtor with other relocation assistance. The chapter of the Massachusetts General Laws governing relocation assistance is chapter 79A. The Debtor asserts that MEDIC defaulted in its obligations under Chapter 79A and that, somehow, this caused the Debtor to lose profits it would otherwise have made at its former location.

In addition to its command to pay relocation costs, chapter 79A requires the taking authority to provide other relocation assistance. The authority is required to obtain the approval of a relocation plan by state authorities. The plan is to spell out such matters as the needs of the business to be displaced, specific information on available commercial property and the details of the relocation program. Upon approval of the plan, the taking authority must "assist owners of displaced businesses ... obtaining and becoming established in suitable business locations...." Mass.Gen.L. ch. 79A, § 6.

The evidence established beyond all doubt that MEDIC fully complied with its obligations to the Debtor under chapter 79A. Indeed, the Debtor's lack of cooperation complicated MEDIC's efforts in this regard. The Debtor's new location, moreover, was among those initially suggested by MEDIC.

Faced at trial with MEDIC's irrefutable evidence on MEDIC's relocation efforts, the Debtor took another tack. Judge Spina's judgment of December 31, 1993 declaring the taking valid also contained a declaration that the Debtor "is entitled to relocation assistance pursuant to G.L. c. 79A, sec. 1, et seq." The Debtor argues this is a binding declaration that MEDIC had not previously fulfilled its relocation obligations and that there was still something to be done in that regard. This greatly distorts Judge Spina's decision. In his lengthy opinion of December 31, 1993, Judge Spina made a finding that MEDIC "offered relocation assistance to the [Debtor] from February 5, 1985 to at least June 1, 1989." His declaratory judgment on the subject must therefore be taken as merely a general recognition of the Debtor's initial eligibility for assistance.

■ The Debtor has one more string to its overly-used bow. Still focusing on Judge Spina's December 31, 1993 declaratory judgment, the Debtor asserts that after that date MEDIC refused to provide it with requested relocation assistance. On January 25, 1994, the Debtor wrote to MEDIC informing MEDIC that the Debtor's new location "appears to encroach upon an area owned by the Town of Montague," and that the Debtor "has sat down with representatives of the Board of Selectmen but we have been told that the ongoing litigation with MEDIC is an impediment." As explained by the Debtor at trial, this obtuse language was intended to convey the message that the issuance of a building permit (required for its renovations) was being held up because underground gas tanks at the new location encroached upon a street owned by the town. In the January 25th letter, the Debtor suggested that MEDIC could solve the problem by taking the area of encroachment by right of eminent domain. Presumably the Debtor wanted any

such taking to be accompanied by a deed to it.

This was a request for assistance which goes far beyond relocation efforts required by chapter 79A. No provision in the chapter suggests the need for assistance in the form of land taking at an owner's new location. MEDIC was obligated to help the Debtor find a new location, and it did. It was not required to change the physical nature of a new location the Debtor had already purchased. The Debtor, in any event, obtained the building permit.

## VII. CONCLUSION

The Debtor is entitled to recover from MEDIC $380,000 as eminent domain damages, plus $36,850 of relocation costs, less $137,250 for the value of its use and occupancy, or a net amount of $279,600. I have today issued judgment in that amount. For the reasons set forth in this opinion, the judgment includes no back interest. The judgment requires the clerk of Franklin Superior Court to disburse to MEDIC, at its request, the entire balance of the bank account resulting from the $356,000 deposit made with the registry of that court, including all earned interest.